# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 2, 2010 Session

## CHRISTOPHER FLAKE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 97-09254  W. Mark Ward, Judge**

---

**No. W2010-00215-CCA-R3-PC  - Filed January 21, 2011**

---

Petitioner, Christopher Michael Flake, was convicted by a Shelby County Jury of two counts of first degree murder. On direct appeal, Petitioner's convictions were reversed on the basis that the jury improperly rejected the proof at trial that established Petitioner was insane at the time of the offenses. *State v. Christopher Flake*, No. W2001-00568-CCA-R3-CD, 2002 WL 1298733 (Tenn. Crim. App., at Jackson, June 12, 2002), *rev'd on appeal by State v. Flake*, 114 S.W.3d 487 (Tenn. 2003). The Supreme Court reversed the decision of this Court on appeal. *State v. Flake*, 114 S.W.3d 487 (Tenn. 2003). Petitioner sought post-conviction relief, among other things, on the basis of ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. After a thorough review of the record, we determine that Petitioner has failed to show that he received ineffective assistance of counsel. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, and CAMILLE R. MCMULLEN, JJ., Joined.

Marty B. McAfee, Memphis, Tennessee, for the appellant, Christopher Flake.

Robert E. Cooper, Jr., Attorney General and Reporter, J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General, and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

The facts giving rise to the underlying convictions were summarized by the Tennessee Supreme Court on appeal in great detail. The undisputed facts showed that Petitioner bought an automatic pistol and murdered Mike Fultz and Fred Bizot. Petitioner was a friend and part-time employee of Mike Fultz; Petitioner attended Alcoholics Anonymous meetings with Fred Bizot. *Flake*, 114 S.W.3d at 490. Petitioner also shot Turner Carpenter, a pastoral counselor. Mr. Carpenter survived the shooting and helped to identify Petitioner as the perpetrator. Petitioner was arrested for the shootings. *Id.* at 492. According to officers, he showed "no emotion" during his arrest and admitted that he "shot the guy" at the church. *Id.* During a search of Petitioner's residence, police located an empty box of .22 caliber cartridges, several live .22 caliber rounds, and a box for a Jennings Model J.25 pistol, which contained the Guns and Ammo receipt. *Id.* at 491-92. There were also prescription bottles belonging to Petitioner that contained Zoloft, Prozac, and Cylert. *Id.* at 492. It appeared that Petitioner did not regularly take his medication. *Id.* The investigation revealed that the bullets recovered from the victims' bodies were fired from the gun seized from the defendant's car. *Id.*

The defense called multiple witnesses to support the affirmative defense of insanity, including several health professionals. During the proceedings prior to trial, Petitioner was deemed incompetent to stand trial. Petitioner was later deemed competent to stand trial in 1999. Petitioner's father testified about Petitioner's medical and social history, detailing Petitioner's troubles with alcohol that started when Petitioner was twelve years of age. *Id.* at 493. Petitioner began seeing a psychologist around this time. *Id.* Petitioner was hospitalized for the first time in 1988, after coming home drunk from a part-time job. *Id.* Petitioner's mother and father were supportive, taking him to Alcoholic's Anonymous meetings and counseling. *Id.* Petitioner's parents attended many of these sessions. Petitioner entered the hospital voluntarily at least two other times prior to graduating from high school. *Id.* Petitioner started college and attended at least three institutes of higher learning where he took classes in criminal justice. *Id.* at 493-94. Petitioner never received a college degree. Petitioner was treated by a psychiatrist during this time period and seemed to decline. Petitioner's behavior was described as "increasingly bizarre." *Id.* at 494. Petitioner claimed that he caused a plane crash and that he knew who was responsible for the Oklahoma City bombing, 1993 World Trade Center bombing, and the Pan America airline bombing. *Id.* at 494-95.

Petitioner presented medical personnel at trial who classified Petitioner as a paranoid schizophrenic who was not able to appreciate the wrongfulness of his conduct in shooting

-2-

the victims. One of the doctors, Dr. Samuel Craddock, a clinical psychologist at Middle Tennessee Mental Health Institute ("MTMHI") conducted a forensic evaluation, during a thirty-day period of inpatient treatment. *Id.* at 499. Dr. Craddock met with Petitioner on nine different occasions. *Id.* He opined that Petitioner was a paranoid schizophrenic who was suffering from severe mental illness at the time of the shootings. *Id.* However, Dr. Craddock admitted that Petitioner's scores on some of the tests indicated a possibility of malingering. *Id.* at 500. After Petitioner was found incompetent, he was returned to MTMHI for ten months prior to his transfer to Western Mental Health Institute. *Id.* At MTMHI, another psychiatrist, Dr. Rokeya Farooque, reported that Petitioner heard voices and suffered from paranoid schizophrenia. Dr. Farooque determined that Petitioner was incompetent to stand trial. *Id.* After Petitioner's transfer to Western Mental Health Institute, Dr. Hilary Linder began treating Petitioner. *Id.* at 501. Dr. Linder determined that Petitioner was a paranoid schizophrenic who was not malingering and unable to appreciate the wrongfulness of his conduct. *Id.* at 501-02. Petitioner's family also hired an expert, Dr. John Hutson, who also determined that Petitioner was a paranoid schizophrenic. *Id.* at 502.

Petitioner was convicted by the jury of two counts of first degree murder. *Id.* at 502-03. Subsequently, Petitioner appealed, arguing that he had met his burden of establishing the insanity defense by clear and convincing evidence and that the jury had erred in rejecting the defense. *Christopher Flake*, 2002 WL 1298773, at *1-2. This Court agreed, stating, "[i]t is our view that if the defendant proved the defense of insanity in the *Carpenter* case, the evidence offered here is even clearer and more convincing. No rational trier of fact could have found otherwise." *Christopher Flake*, 2002 WL 1298773, at * 8. Consequently, this Court modified the judgment to not guilty by reason of insanity and remanded the case to the trial court for further proceedings pursuant to Tennessee Code Annotated section 33-7-303. *Id.*

The State appealed to the Tennessee Supreme Court, who determined, in a split decision:

> In reversing the jury's verdict, the Court of Criminal Appeals' opinion appears not to have considered the evidence elicited by the prosecution through vigorous cross-examination. The intermediate appellate court instead focused

upon the State's failure to offer rebuttal proof. As noted in *Flake I*,[1] the statute does not require the prosecution to offer rebuttal proof, although the prosecution likely will counter defense proof by some means, including vigorous cross-examination. After reviewing all the evidence in this record in the light most favorable to the State, this Court is unable to conclude that no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence. Therefore, that portion of the judgment of the Court of Criminal Appeals modifying the jury's verdict to not guilty by reason of insanity is reversed.

*Flake*, 114 S.W.3d at 507. Petitioner sought a rehearing on the basis that the court failed to address one of Petitioner's issues. The motion for rehearing was denied on October 24, 2002.

Subsequently, Petitioner sought post-conviction relief. The petitioner alleged that Petitioner received ineffective assistance of counsel at trial and on appeal. Specifically, Petitioner claimed that counsel: (1) failed to obtain an MRI and/or PET scan to show that Petitioner had a "broken" brain; and (2) failed to request a change in venue. The post-conviction court ordered a competency evaluation. Petitioner then filed an amended petition for post-conviction relief. In the amended petition, Petitioner again asserted that he received ineffective assistance of counsel. Specifically, Petitioner claimed that counsel: (1) failed to depose Dr. Janet Johnson prior to her death; (2) failed to subpoena Dr. Curry for trial; (3) failed to prepare and elicit testimony from "lay persons" who knew Petitioner prior to the offense; (4) failed to object to the State's questioning of defense experts and (5) failed to challenge the constitutionality of the insanity defense statute. A second amended petition for relief raised similar issues. Petitioner also raised various claims of legal error in his petitions for relief: (1) the insanity defense statute is unconstitutionally vague; (2) the insanity defense

---

[1] *State v. Flake*, 88 S.W.3d 540 (Tenn. 2002) ("*Flake I*"), involved a separate appeal from Petitioner's conviction for attempted voluntary manslaughter of Mr. Carpenter. In the direct appeal from that conviction, Petitioner asserted the same argument that the jury improperly rejected the insanity defense. This Court agreed. *See State v. Flake*, No. W2000-01131-CCA-R3-CD, 2001 WL 792621(Tenn. Crim. App., at Jackson, July 13, 2001), *rev'd on appeal by State v. Flake*, 88 S.W.3d 540 (Tenn. 2002). This Court's decision was also overturned on appeal by the supreme court who determined:

> [A]n appellate court should reverse a jury verdict rejecting the insanity defense only if, after viewing the evidence in the light most favorable to the State, the appellate court concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of committing the offense was established by clear and convincing evidence.

*Flake I*, 88 S.W.3d at 542.

statute is unconstitutional because is shifts the burden to the defense ; (3) the insanity defense violates the 5th, 6th, and 14th Amendments of the United States Constitution; (4) the jury instructions were improper; and (7) the evidence was insufficient.

*Evidence at the Post-conviction Hearing*

At the post-conviction hearing, the post-conviction court heard from William Anthony Crawford, Petitioner's former teacher. Mr. Crawford first met Petitioner when Petitioner was a junior in high school. Mr. Crawford was a sponsor of a group that supported kids who had been in drug rehabilitation. He described Petitioner as "likeable" and "gregarious." The two stayed in touch after Petitioner graduated from high school.

Petitioner actually lived with Mr. Crawford for a while after he graduated from high school. At that time, Mr. Crawford realized that Petitioner had "some more serious issues" than he realized. Mr. Crawford described Petitioner's problem with alcohol in detail, explaining that Petitioner would often stay up for two or three days at a time and then sleep for "as long as he would be allowed to sleep, sometimes more than a day." Mr. Crawford maintained contact with Petitioner's parents on a regular basis in hopes that they could work together to figure out "what the problem was [with Petitioner]."

Mr. Crawford opined that Petitioner had some type of "bipolar disorder" and was depressed. Mr. Crawford saw a gradual decline in Petitioner's mental state over the five or six years that he knew him. Mr. Crawford was so concerned that he confiscated all of Petitioner's ammunition. Mr. Crawford explained that he took the ammunition so that if Petitioner was going to "shoot me or someone else," Petitioner would have to go buy ammunition first.

Petitioner lived with Mr. Crawford until he attacked him one morning, going "ballistic" and grabbing Mr. Crawford around the neck. Mr. Crawford did not see Petitioner very often after he moved out. Mr. Crawford recalled Petitioner's visiting him one time to ask if one of his past girlfriends had "come on" to Mr. Crawford. Mr. Crawford denied the allegation and Petitioner left.

Petitioner's father testified at the post-conviction hearing. Mr. James Flake recounted a large portion of his trial testimony before focusing on Petitioner's post-conviction claims. Mr. James Flake testified that he took Petitioner to see Dr. Johnson on April 1, 1997, a few days prior to the murders. Dr. Johnson was in her late 60s at that time. After Petitioner was arrested, Mr. James Flake asked trial counsel to depose or interview Dr. Johnson. Mr. James Flake expressed his concern about Dr. Johnson's health and viability. Dr. Johnson died one

year later without being interviewed or deposed by the defense. Mr. James Flake admitted that Dr. Johnson died during the time that Petitioner was deemed incompetent to stand trial.

Mr. James Flake also testified that he informed the defense team that he wanted Dr. Duncan Curry[2] to testify at trial. Trial counsel informed Mr. James Flake that Dr. Curry was not interested in testifying at trial because of the time it would take to testify and the income he would lose by expending that amount of time. Trial counsel informed Mr. James Flake that he did not want to call Dr. Curry as a witness if he was going to be "angry." Dr. Curry was not subpoenaed prior to trial.

Mr. James Flake testified that he also asked trial counsel to call Mr. Crawford as a witness. Mr. James Flake insisted that trial counsel failed to "follow-up and develop" Mr. Crawford and claimed that he could not get in touch with Mr. Crawford. Mr. James Flake admitted that he could not get in touch with Mr. Crawford.

On cross-examination, Mr. James Flake admitted that trial counsel called several experts to testify at trial. Additionally, Mr. James Flake noted that one of the doctors referenced Dr. Johnson's treatment of Petitioner at trial.

Trial counsel testified that he was assisted at trial by co-counsel. Co-counsel did not testify at the post-conviction hearing. Trial counsel recalled that the defense theory was that Petitioner was insane. In other words, the defense utilized a "mental defense."

Prior to trial, counsel and co-counsel reviewed the medical and psychotherapy records. Trial counsel recalled that the defense team hired Dr. John Hutson. Trial counsel stated that as a result of the evaluation performed by Dr. Hutson, Petitioner was evaluated by both Dr. Craddock and Dr. Farooque at MTMHI. Both doctors supported Petitioner's diagnosis and concluded that Petitioner could not appreciate the wrongfulness of his actions. Trial counsel recalled that he utilized the testimony of seven experts at trial. Trial counsel recalled that Dr. Johnson passed away fairly early in the trial process. He commented that the experts that were utilized at trial discussed Petitioner's medical history in detail.

Trial counsel was questioned about his decision not to call Mr. Crawford as a witness. Trial counsel stated that there was a possibility that some of Mr. Crawford's testimony about Petitioner would be negative.

---

[2] Dr. Curry is sometimes referred to in the transcript and technical record as "Dr. Currie." For consistency, we will refer to him as Dr. Curry.

At the conclusion of the post-conviction hearing, the post-conviction court took the matter under advisement. The post-conviction court later entered an order denying the petition for post-conviction relief. Specifically, the post-conviction court determined that the allegation made by Petitioner that the evidence was insufficient to support the convictions was previously determined. Further, the post-conviction court determined that all other allegations of legal error were waived "by failing to raise them in the trial court and/or on direct appeal." The post-conviction court noted specifically the constitutionality of the insanity defense statute had been previously challenged in other cases. As to ineffective assistance of counsel, the post-conviction court determined that Petitioner failed to present evidence regarding an MRI or PET scan at the post-conviction hearing and no mention was made of this issue at the post-conviction hearing. Therefore, Petitioner failed to carry his burden. The post-conviction court also noted that the only evidence presented with regard to the change of venue issue was from Petitioner's father. Thus, the post-conviction court determined that Petitioner failed to carry his burden to prove ineffective assistance of counsel. The post-conviction court determined that Petitioner failed to show prejudice with regard to the failure of trial counsel to depose Dr. Johnson prior to trial in light of the "extensive" testimony at trial from expert witnesses. The post-conviction court noted that Petitioner failed to call Dr. Curry as a witness at the post-conviction hearing and determined that his testimony would likely have been cumulative at trial. In other words, the post-conviction court determined that Petitioner, again, failed to show prejudice. The post-conviction court held that Petitioner failed to show prejudice due to trial counsel's failure to call Mr. Crawford as a witness because Mr. Crawford's testimony did "not appear to be such that it would have had any great significance on the outcome of the trial." The post-conviction court determined that there was no evidence introduced at the post-conviction hearing on the failure of the trial court to include "wrongfulness" in the jury instructions so Petitioner failed to carry his burden of proof. The post-conviction court determined that Petitioner failed to demonstrate deficient performance on the basis of trial counsel's failure to challenge the constitutionality of the death penalty because "any challenge to the statute would not have succeeded." Finally, the post-conviction court determined that Petitioner was not entitled to relief based on trial counsel's failure to object to the State's questioning of defense experts. The post-conviction court determined that the lack of the objection was the result of a tactical trial strategy by trial counsel. The post-conviction court denied the petition.

Petitioner subsequently filed a notice of appeal, challenging the denial of his petition for relief.

*Analysis*
*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

-8-

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

*Failing to Call Dr. Curry as a Witness*

Petitioner argues on appeal that trial counsel was ineffective for failing to call Dr. Curry as a witness. Specifically, Petitioner mentions that trial counsel could not recall why Dr. Curry was not called as a witness, but Mr. James Flake testified that Dr. Curry was reluctant to be called as a witness because he would lose money in his practice by devoting time to Petitioner's trial. Petitioner argues that it "is not a 'reasonably-based' trial strategy to decline to call a key expert on the sole basis that financial concerns caused the expert to be reluctant to testify." Petitioner insists that he was prejudiced by the failure of trial counsel to call Dr. Curry because there was a reasonable probability that the testimony would have affected the outcome of the trial. The State disagrees.

At the post-conviction hearing, Petitioner did not call Dr. Curry as a witness. Instead, he relied on the testimony of his father about Dr. Curry's reluctance to testify. Trial counsel could not specifically recall the reason that Dr. Curry was not utilized as a witness. The post-conviction court determined that it appeared that Dr. Curry's testimony would have been "cumulative." The post-conviction court also determined that, based on the number of expert witnesses that were called to testify at trial, the "failure to call one additional expert who was a reluctant witness is within the realm of legitimate trial strategy."

The record supports the post-conviction court's findings. Again, Petitioner did not call Dr. Curry as a witness at the post-conviction hearing. Therefore, the post-conviction court was unable to determine what, if any, affect Dr. Curry's testimony would have had on the outcome of the trial. If a "petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner has failed to demonstrate clear and convincing evidence that he is entitled to relief. This issue is without merit.

*Failure to Depose or Interview Dr. Johnson*

Petitioner next argues that trial counsel was ineffective for failing to depose or interview Dr. Johnson prior to trial and her death. Petitioner argues that Mr. James Flake informed trial counsel that Dr. Johnson was ill and trial counsel did nothing to preserve her testimony. Further, Petitioner argues that her testimony was crucial to the defense because she was responsible for Petitioner's mental health care for the two years prior to the murders. Mr. James Flake testified that Dr. Johnson told him that she "screwed up big time" because Petitioner was "far worse" than she thought. The State contends, on the other hand, that Petitioner failed to show that he was prejudiced by trial counsel's failure to interview or depose Dr. Johnson.

At the post-conviction hearing, Mr. James Flake testified that he informed trial counsel that Dr. Johnson was in poor health and that there was a need to preserve her testimony. Trial counsel testified that he was unaware of any health concerns involving Dr. Johnson. In the order denying post-conviction relief, the post-conviction court accredited the testimony of trial counsel. It is well-settled that, "questions of credibility of witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The record does not preponderate against the determination of the post-conviction court. Petitioner is not entitled to relief on this issue.

*Failure to Call Mr. Crawford as a Witness*

Petitioner contends that trial counsel was ineffective for failing to call Mr. Crawford as a witness at trial. The State argues that the determination of the post-conviction court was proper; Petitioner failed to show prejudice and deficient performance.

At the post-conviction hearing, the proof revealed that trial counsel attempted to contact Mr. Crawford to no avail. Further, trial counsel testified that he made a tactical decision not to pursue Mr. Crawford's testimony because it had potentially negative aspects that could affect Petitioner's image during trial. At the post-conviction hearing, Mr. Crawford testified that Petitioner had a deteriorating mental condition. Additionally, Mr. Crawford testified that Petitioner attacked him one time, that he was afraid Petitioner could attack him again, and that Petitioner had admitted to incidents in which he was abusive to past girlfriends. The post-conviction court determined that there was "no reasonable probability that [Mr. Crawford's testimony] would have altered the outcome of the trial" so Petitioner failed to prove "prejudice." Further, the post-conviction court held that the decision as to what witnesses to call at trial is a tactical decision by trial counsel. Again, this

Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See Adkins*, 911 S.W.2d at 347. Petitioner is not entitled to relief on this issue.

*Failure to Challenge Constitutionality of the Insanity Defense Statute*

Lastly, Petitioner complains that he received ineffective assistance of counsel because trial counsel failed to challenge the constitutionality of Tennessee's insanity defense statute. Petitioner alleges that trial counsel should have recognized that the statute was unconstitutional because it shifted the burden to Petitioner to prove mens rea. The State argues that the statute has been unsuccessfully challenged prior to Petitioner's case.

The post-conviction court noted that the statute has survived challenges to its constitutionality. In fact, the statute was challenged and upheld in *State v. Holton*, 126 S.W.3d 845 (Tenn. 2004), *State v. Holder*, 15 S.W.3d 905 (Tenn. Crim. App. 1999), and *State v. Perry*, 13 S.W.3d 724 (Tenn. Crim. App. 1999). In light of established precedent, Petitioner did not show how trial counsel would have been successful in challenging the statute. Petitioner has failed to provide clear and convincing evidence that he received ineffective assistance of counsel. This issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JERRY L. SMITH, JUDGE